BERGER, Judge.
 

 *665
 
 On November 17, 2016, a Wayne County jury convicted Joshua A. Bice ("Defendant") of possession of marijuana and trafficking opium by possession. Defendant alleges (1) error in the trial court's admission of hearsay; (2) a fatal variance between Defendant's indictment for trafficking opium by possession and the State's evidence; (3) error in the trial court's failure to instruct the jury on the statutory ultimate user exemption; and (4) ineffective assistance of counsel. We find no error.
 

 Factual and Procedural Background
 

 On the evening of September 18, 2015, Goldsboro Police Officer Donnie Head ("Officer Head") and North Carolina Alcohol Law Enforcement Agent Brian White ("Agent White") were parked in an unmarked police car at a Kangaroo gas station in Goldsboro, North Carolina, where they observed a Ford pick-up truck parked at the gas
 
 *666
 
 pumps. Rather than pumping gas, the driver of the pick-up truck, later identified to be Jason Hyland ("Hyland"), remained in his vehicle until Defendant's silver Honda pulled into the parking lot. Hyland immediately exited his vehicle and walked to Defendant's parked car.
 

 Officer Head testified at trial that when Hyland reached Defendant's car, they "transfer[red] something between their hands." Hyland immediately returned to his vehicle. Based upon their training and experience, Officer Head and Agent White believed they had witnessed a drug transaction and decided to investigate further. Officer Head approached Defendant while Agent White approached Hyland.
 

 When Officer Head approached Defendant, he observed "[Defendant] sitting in the driver's seat. There [were] no other occupants in the vehicle. [Defendant] was holding a pill bottle in his hand." After Officer Head identified himself and informed Defendant why he was there, Officer Head witnessed Defendant "quickly hid[e] the pill bottle down between his leg[s]." At Officer Head's direction, Defendant identified himself and handed Officer Head the pill bottle, which contained fifty-four oxycodone pills prescribed to Grover Bice.
 

 After Officer Head asked Defendant to step out of his car, Defendant told him that the pills belonged to Defendant's father, who was receiving cancer treatment. Officer Head then searched Defendant and found $190.00 in cash in Defendant's wallet and a clear bag of marijuana in the pocket of his pants. Defendant was placed under arrest and read his
 
 Miranda
 
 rights, which Defendant expressly waived by signing and initialing a written waiver.
 

 When Defendant was interviewed, he admitted he went to the gas station to buy marijuana. Defendant also claimed the oxycodone pills belonged to his father, who often rode in Defendant's car. Defendant signed and initialed each line of a written confession, which stated:
 

 I made a mistake. I was trying to help my parents out because my dad has cancer. I was selling the pills to make money to pay bills. I don't get a profit off it. I just started selling them today. I have never sold them before. I don't sell any other drugs. It was stupid of me. He just got them filled today. There was 100 pills. My dad kept 5. I sold Jason Hyland 41 earlier today for $250.00 cash. Tonight he was going to buy 12 pills for $100 cash approximately.
 

 *263
 
 I looked on Google to see how much they sold on the street for. I saw they sold for $5-$15 each.
 

 *667
 
 Defendant was indicted for trafficking opium by possession, possession with intent to sell or deliver opium, and possession of marijuana. Prior to trial, the State dismissed the charge of possession with intent to sell or deliver opium.
 

 At trial, Defendant testified that he had never seen the confession bearing his signature and initials. However, when asked to review the confession, Defendant admitted that he signed and initialed each line of the statement. Defendant also testified that he recognized the specific content of his
 
 Miranda
 
 rights waiver and remembered reviewing, signing, and initialing each line of this waiver during the same interrogation. Defendant also admitted that he understood "quite well" that he was "in a very serious situation" when he was being interrogated, and also acknowledged that he had conducted internet research of his father's medication.
 

 Officer Head testified that Defendant's confession reflected an exact transcription of Defendant's responses to Officer Head's interview questions. Officer Head also testified that he read the statement to Defendant, and handed the statement to Defendant. Defendant then "read over the statement, he initialed each line, that this-these were his words and this was a correct statement, and then at the very end of it I had him draw a line from the bottom of his statement to the bottom of the page so I couldn't write or change anything in this statement where he signed and put the date." Officer Head also stated that he gave Defendant the opportunity to make any changes to the written confession, but Defendant did not "indicate he wanted to add anything, or change anything."
 

 Neither Agent White nor Hyland testified at trial. However, Officer Head testified that Agent White found several $20.00 bills in Hyland's possession, but no pills or other contraband. Because Agent White was not present at trial, Officer Head was allowed to read into evidence a hand-written statement that Hyland had given to Agent White. Defendant did not object to the admission of Hyland's statement, which said: "I, Jason Hyland, met with [Defendant] at Bojangles' in Princeton to buy oxycodone [and] an hour later at the Kangaroo on 70 where I was about to purchase more and the cops saw us about to do a hand-to-hand and approached us." The statement was signed by Hyland; dated September 18, 2015, at 11:12 p.m.; and was corroborated by Defendant's testimony that he had met with Hyland at Bojangles' earlier on September 18, 2015 to purchase more than three grams of marijuana.
 

 After the statement was read into evidence, the State offered a copy of Hyland's hand-written statement into evidence. The trial court
 
 *668
 
 specifically asked if there were any objections to the admission of Hyland's statement, and Defendant replied that he had no objection to its admission.
 

 Defendant was convicted of trafficking opium by possession and possession of marijuana. He was sentenced to seventy to ninety-three months in prison, fined $50,000.00, and placed on probation upon his release from prison. Defendant timely appeals, alleging the trial court erred by admitting Hyland's hearsay statement, denying his motion to dismiss on fatal variance grounds, and by not instructing the jury on the statutory ultimate user exemption. Defendant also asserts he received ineffective assistance of counsel.
 

 Analysis
 

 I.
 
 Hearsay
 

 Defendant first challenges the trial court's admission of Hyland's written statement into evidence, arguing that it was inadmissible hearsay. Defendant concedes he failed to object to the admission of the statement, and thus, did not preserve this issue for review. Instead, Defendant requests this Court review the admission of Hyland's statement for plain error. We find that Defendant is not entitled to appellate review on this issue.
 

 "In criminal cases, an issue that was not preserved by objection noted at trial and that is not deemed preserved by rule or law without any such action nevertheless may be made the basis of an issue presented on appeal when the judicial action questioned is
 
 *264
 
 specifically and distinctly contended to amount to plain error." N.C.R. App. P. 10(a)(4) ;
 
 see also
 

 State v. Goss
 
 ,
 
 361 N.C. 610
 
 , 622,
 
 651 S.E.2d 867
 
 , 875 (2007),
 
 cert. denied
 
 ,
 
 555 U.S. 835
 
 ,
 
 129 S.Ct. 59
 
 ,
 
 172 L.Ed.2d 58
 
 (2008). The Supreme Court of North Carolina "has elected to review unpreserved issues for plain error when they involve either (1) errors in the judge's instructions to the jury, or (2) rulings on the admissibility of evidence."
 
 State v. Gregory
 
 ,
 
 342 N.C. 580
 
 , 584,
 
 467 S.E.2d 28
 
 , 31 (1996),
 
 cert. denied
 
 ,
 
 525 U.S. 952
 
 ,
 
 119 S.Ct. 382
 
 ,
 
 142 L.Ed.2d 315
 
 (1998).
 

 Plain error arises when the error is "so basic, so prejudicial, so lacking in its elements that justice cannot have been done."
 
 State v. Odom
 
 ,
 
 307 N.C. 655
 
 , 660,
 
 300 S.E.2d 375
 
 , 378 (1983) (citation and quotation marks omitted),
 
 cert. denied
 
 ,
 
 459 U.S. 1018
 
 ,
 
 74 L.Ed. 2d 513
 
 (1982) ). "Under the plain error rule, defendant must convince this Court not only that there was error, but that absent the error, the jury probably would
 
 *669
 
 have reached a different result."
 
 State v. Jordan
 
 ,
 
 333 N.C. 431
 
 , 440,
 
 426 S.E.2d 692
 
 , 697 (1993).
 

 Here, Defendant has failed to demonstrate that any "judicial action" by the trial court amounted to error. N.C.R. App. P. 10(a)(4). Defendant not only failed to object to the entry of Hyland's statement, but he also expressly consented to the admission of the same. Defendant now argues that the admission of Hyland's statement was an error by the trial court.
 

 When the State introduced Hyland's written statement at trial, the following exchange took place:
 

 THE COURT: All right. Any objection to State's Exhibit No. 7?
 

 [Defense Counsel:] No, sir, Judge.
 

 THE COURT: All right. Then State's Exhibit No. 7 is hereby admitted into evidence.
 

 This action by defense counsel to consent to the admission of Hyland's statement may have been the result of strategic decisions made by Defendant and trial counsel, or Hyland's statement may have been admitted because of questionable performance by counsel. Whatever the reason, a trial court is not required to second guess every decision, action, or inaction by defense counsel. Imposing such a requirement on our trial courts is neither desirable nor workable.
 

 While the trial court should "see that the essential rights of an accused are preserved, the judge should not interfere in the attorney-client relationship in the absence of such gross incompetence or faithlessness of counsel as should be apparent to the trial judge and thus call for action by him."
 
 State v. Blackwood
 
 ,
 
 60 N.C. App. 150
 
 , 153,
 
 298 S.E.2d 196
 
 , 199 (1982) (citation and quotation marks omitted). Even though Defendant has argued that his counsel's assistance was deficient, he has not alleged his trial counsel was grossly incompetent or faithless in his duties, and the record does not reflect gross deficiencies.
 

 In
 
 State v. Lashley
 
 , the defendant alleged on appeal, among other things, that the trial court erred in admitting certain evidence despite the lack of objection by a
 
 pro se
 
 defendant. This Court stated that
 
 pro se
 
 defendants were not wards or clients of the court, and they could not "expect the trial judge to relinquish his role as impartial arbiter in exchange for the dual capacity of judge and guardian angel of defendant."
 
 State v. Lashley
 
 ,
 
 21 N.C. App. 83
 
 , 85,
 
 203 S.E.2d 71
 
 , 72 (1974).
 

 *670
 
 Defendants who are represented by counsel are not entitled to greater protections by the trial court than those afforded to
 
 pro se
 
 defendants.
 

 Thus, because Defendant not only failed to object but also expressly consented to the admission of Hyland's statement, we cannot conclude the trial court erred by permitting the admission of such evidence per both parties' agreement.
 

 Even if Defendant could correctly assert the trial court somehow erred, "[a] defendant is not prejudiced by the granting of relief which he has sought or by error resulting from his own conduct." N.C. Gen. Stat. § 15A-1443(c) (2017). "Thus, a defendant who invites error has waived his right to all appellate review concerning the invited error, including plain error review."
 

 *265
 

 State v. Barber
 
 ,
 
 147 N.C. App. 69
 
 , 74,
 
 554 S.E.2d 413
 
 , 416 (2001),
 
 disc. review dismissed
 
 ,
 
 355 N.C. 216
 
 ,
 
 560 S.E.2d 142
 
 (2002).
 

 Where a defendant "posed a question that incorporated inadmissible material [during cross-examination], [d]efendant is simply not entitled to seek appellate relief on the grounds that the challenged testimony should have been excluded."
 
 State v. Dew
 
 ,
 
 225 N.C. App. 750
 
 , 758,
 
 738 S.E.2d 215
 
 , 221,
 
 disc. review denied
 
 ,
 
 366 N.C. 595
 
 ,
 
 743 S.E.2d 187
 
 (2013). This is because "[s]tatements elicited by a defendant on cross-examination are, even if error, invited error, by which a defendant cannot be prejudiced as a matter of law."
 
 State v. Gobal
 
 ,
 
 186 N.C. App. 308
 
 , 319,
 
 651 S.E.2d 279
 
 , 287 (2007) (citations omitted),
 
 affirmed
 
 ,
 
 362 N.C. 342
 
 ,
 
 661 S.E.2d 732
 
 (2008).
 

 Here, although neither Agent White nor Hyland were present to testify at trial, Officer Head read Hyland's statement into evidence and the written statement was admitted without objection and with Defendant's consent. However, the State did not elicit the introduction of Hyland's statement during Officer Head's direct examination. In fact, neither the State nor Officer Head referenced Hyland by name nor mentioned his statement during direct examination.
 

 Rather, during Officer Head's cross examination, Defendant elicited the following testimony regarding Hyland and his statement:
 

 [Defense Counsel:] Okay. And the other gentleman was released.
 

 [Officer Head:] Yes.
 

 [Defense Counsel:] Okay. Now, was he released there at the scene?
 

 *671
 
 [Officer Head:] He was.
 

 [Defense Counsel:] He was? Well, if he was released at the scene, um ... if he was released at the scene, how did the statement become or how did they-how was a statement obtained from him at 11:12 that evening ... in this case?
 

 [Officer Head:] The ALE agent, Special Agent White, took the statement on-scene, and then released him.
 

 [Defense Counsel:] He took the statement on-scene?
 

 [Officer Head:] Correct.
 

 [Defense Counsel:] Okay. And where-did he handwrite it out or what?
 

 [Officer Head:] I'm not sure, I was not-I didn't see him write the statement; I was dealing with [Defendant] while Special Agent White was dealing with [Hyland].
 

 [Defense Counsel:] Okay.
 
 So he got it-he obtained a statement from the other individual that a drug transaction didn't take place and released him at the scene.
 

 [Officer Head:] I can read that statement if you wish me to.
 

 [Defense Counsel:] No, I just-I was just wondering where the statement came-did you see him do that with the other gentleman?
 

 [Officer Head:] Special Agent White took the statement. I was not right there when the statement was being given, so I can't testify of who wrote the statement or.
 

 [Defense Counsel:] Okay. ...
 

 (Emphasis added.)
 

 Defendant's questions concerning the content of Hyland's statement opened the door to the State's subsequent questions concerning the statement and introduction of the written statement. In response to Defendant's questions on cross examination, the State then asked Officer Head to identify and read Hyland's statement to the jury for the first time during re-direct examination. The State then offered a copy of Hyland's written statement into evidence as State's Exhibit 7.
 

 *672
 
 Not only did Defendant open the door to the introduction of Hyland's statement, but, again, Defendant explicitly consented to its admission into evidence. Accordingly, we find no error in the introduction of Hyland's statement.
 

 II.
 
 Fatal Variance
 

 Defendant next argues that the trial court erred in denying his motion to dismiss his trafficking opium by possession charge as there was a fatal variance between the allegations contained in the indictment and the evidence offered at trial. However, Defendant failed to properly preserve this argument for review because he raises this issue for the first time on appeal.
 

 *266
 
 A fatal variance between the indictment and proof is properly raised by a motion for judgment as of nonsuit or a motion to dismiss, since there is not sufficient evidence to support the charge laid in the indictment. A motion to dismiss for a variance is in order when the prosecution fails to offer sufficient evidence the defendant committed the offense charged. A variance between the criminal offense charged and the offense established by the evidence is in essence a failure of the State to establish the offense charged.
 

 State v. Glenn
 
 ,
 
 221 N.C. App. 143
 
 , 147,
 
 726 S.E.2d 185
 
 , 188 (2012) (
 
 purgandum
 

 [1]
 
 ).
 

 "In order to preserve a fatal variance argument for appellate review, a defendant must specifically state at trial that a fatal variance is the basis for his motion to dismiss."
 
 State v. Scaturro
 
 , --- N.C. App. ----, ----,
 
 802 S.E.2d 500
 
 , 505 (citations omitted),
 
 disc. review dismissed as moot
 
 ,
 
 370 N.C. 217
 
 ,
 
 804 S.E.2d 530
 
 (2017). For example, in
 
 State v. Hooks
 
 , this Court dismissed defendant's fatal variance argument because defendant "based his motion to dismiss solely on insufficiency of the evidence ... [and] did not allege the existence of a fatal variance between the indictment and the jury instructions" at trial.
 
 State v. Hooks
 
 ,
 
 243 N.C. App. 435
 
 , 442,
 
 777 S.E.2d 133
 
 , 139,
 
 disc. review denied, cert. denied
 
 ,
 
 368 N.C. 605
 
 ,
 
 780 S.E.2d 561
 
 (2015).
 

 *673
 
 Here, a review of the trial transcript reveals that Defendant never alleged a fatal variance when he moved to dismiss his trafficking opium by possession charge at trial. Instead, as in
 
 Hooks
 
 , Defendant moved for dismissal based on insufficiency of the evidence rather than a fatal variance. Defendant has waived his right to appellate review of this issue, and it is dismissed.
 

 III.
 
 Jury Instruction
 

 Defendant asserts that the trial court erred in failing to instruct the jury on an exemption to his trafficking opium by possession charge. More specifically, Defendant contends that he is exempt from prosecution for violating Section 90-95(h)(4) of North Carolina's Controlled Substances Act ("the Controlled Substances Act") because he is an "ultimate user" pursuant to Section 90-101(c) of the Controlled Substances Act. Defendant concedes that he did not request an instruction on the ultimate user exemption at trial nor did he object to the trial court's omission of this instruction. Defendant therefore requests for this Court to review for plain error. We find no plain error.
 

 In order to establish plain error, Defendant "must demonstrate that a fundamental error occurred at trial. To show that an error was fundamental, a defendant must establish prejudice-that, after examination of the entire record, the error had a probable impact on the jury's finding that defendant was guilty."
 
 State v. Lawrence
 
 ,
 
 365 N.C. 506
 
 , 518,
 
 723 S.E.2d 326
 
 , 334 (2012) (
 
 purgandum
 
 ).
 

 Our Supreme Court has held "on numerous occasions that it is the duty of the trial court to instruct the jury on all of the substantive features of a case."
 
 State v. Loftin
 
 ,
 
 322 N.C. 375
 
 , 381,
 
 368 S.E.2d 613
 
 , 617 (1988) (citations omitted). "All defenses arising from the evidence presented during the trial constitute substantive features of a case and therefore warrant the trial court's instruction thereon."
 

 Id.
 

 (citations omitted).
 

 "Failure to instruct upon all substantive or material features of the crime charged is error."
 
 State v. Bogle
 
 ,
 
 324 N.C. 190
 
 , 195,
 
 376 S.E.2d 745
 
 , 748 (1989). The trial court's duty to instruct the jury "arises notwithstanding the absence of a request by one of the parties for a particular instruction."
 
 Loftin
 
 ,
 
 322 N.C. at 381
 
 ,
 
 368 S.E.2d at 617
 
 (citations omitted).
 

 For a jury instruction to be required on a particular defense, there must be substantial evidence of each element of the
 
 *267
 
 defense when the evidence is viewed in the light most favorable to the defendant. Substantial evidence is evidence that a reasonable person would find
 
 *674
 
 sufficient to support a conclusion. Whether the evidence presented constitutes substantial evidence is a question of law.
 

 State v. Hudgins
 
 ,
 
 167 N.C. App. 705
 
 , 709,
 
 606 S.E.2d 443
 
 , 446 (2005) (
 
 purgandum
 
 ).
 

 Section 90-95 of the Controlled Substances Act "makes the possession, transportation[,] or delivery of a controlled substance a crime."
 
 State v. Beam
 
 ,
 
 201 N.C. App. 643
 
 , 649,
 
 688 S.E.2d 40
 
 , 44 (2010). Any person who possesses more than four but less than fourteen grams of opium can be found guilty of the Class F felony of trafficking opium by possession.
 
 N.C. Gen. Stat. § 90-95
 
 (h)(4)(a) (2017). The defendant "unlawfully possesses" opium if he or she knowingly possesses it with "both the power and intent to control the disposition or use of that substance."
 
 State v. Galaviz-Torres
 
 ,
 
 368 N.C. 44
 
 , 50,
 
 772 S.E.2d 434
 
 , 438 (2015).
 

 However, Section 90-101(c) dictates that some individuals are deemed lawful possessors of certain controlled substances.
 
 N.C. Gen. Stat. § 90-101
 
 (c) (2017). One such individual is "[a]n ultimate user or a person in possession of any controlled substance pursuant to a lawful order of a practitioner."
 
 N.C. Gen. Stat. § 90-101
 
 (c)(3). The Controlled Substances Act defines an "ultimate user" as "a person who lawfully possesses a controlled substance for his own use, or for the use of a member of his household."
 
 N.C. Gen. Stat. § 90-87
 
 (27) (2017).
 

 Defendant does not contest that he was found in possession of "54 dosage units of Oxycodone weighing 6.89 grams." Rather, Defendant contends that the trial court erred in not instructing the jury
 
 sua sponte
 
 on the ultimate user exemption. However, we find that the record lacks substantial evidence by which a jury instruction on the ultimate user exemption would have been required.
 

 The evidence tended to show that Defendant did not lawfully possess fifty-four of his father's oxycodone pills solely for his father's prescribed use, as required to fall within the ultimate user exemption. Rather, the record reflects overwhelming evidence demonstrating that Defendant possessed his father's oxycodone for his own purpose of unlawfully selling his father's pills.
 

 While Defendant presented evidence that the oxycodone found in his possession was prescribed to his father, that Defendant would drive his father to and from appointments related to his care, and that Defendant lived with and cared for his father, no reasonable person
 
 *675
 
 could conclude that Defendant was in lawful possession of his father's oxycodone at the time of his arrest.
 

 Defendant signed and initialed each line of a written confession in which Defendant admitted that he "was selling the pills to make money to pay bills ... [and had] sold Jason Hyland 41 [pills] earlier [that day] for $250.00 cash." Defendant's written confession also stated that Defendant "looked on Google to see how much money [the oxycodone pills] sold on the street for" and that Defendant was planning to sell twelve more pills to Hyland later that night. Defendant's written confession was corroborated by Defendant's trial testimony, in which Defendant conceded that he recently researched oxycodone.
 

 Moreover, although Defendant testified that he had never seen his signed confession before trial, he later admitted under oath that he signed and initialed each line of his written confession. Defendant also testified that he recognized the specific content of his
 
 Miranda
 
 rights waiver and remembered reviewing, signing, and initialing each line of this waiver during the same interrogation. Defendant further admitted that he understood "quite well" that he was "in a very serious situation" when he was being interrogated.
 

 Because Defendant failed to present substantial evidence that he possessed the fifty-four oxycodone pills solely for his father's lawful use, he was not entitled to an instruction under Section 90-87(27), even when the evidence is viewed in the light most favorable to Defendant. Thus, the trial court did not err as no instruction on the ultimate user exemption was required. Because the evidence did not support the instruction, Defendant cannot show plain error.
 

 *268
 
 IV.
 
 Ineffective Assistance of Counsel
 

 Finally, Defendant asserts that he received ineffective assistance of counsel because his counsel failed to object and agreed to the admission of Hyland's statement and failed to request a jury instruction on the ultimate user exception. We decline to address this claim on direct appeal.
 

 If "the record before this [c]ourt is not thoroughly developed regarding ... counsel's reasonableness, or lack thereof, ... [then] the record before us is insufficient to determine whether defendant received ineffective assistance of counsel."
 
 State v. Todd
 
 ,
 
 369 N.C. 707
 
 , 712,
 
 799 S.E.2d 834
 
 , 838 (2017). Here, the record before us is insufficient to determine whether trial counsel was ineffective or whether there were reasonable, strategic reasons for counsel's actions. Accordingly, we dismiss
 
 *676
 
 Defendant's ineffective assistance of counsel claim without prejudice to his right to assert his claim in a motion for appropriate relief.
 

 Conclusion
 

 Accordingly, we find no error in the trial court's admission of Hyland's statement as there was no "judicial action" at issue where both parties consented to the entry of the statement. In addition, Defendant has waived appellate review of his fatal variance claim. Defendant was not entitled to an instruction on the ultimate user exemption, and the trial court was not required to provide an instruction to the jury on this issue
 
 sua sponte
 
 . Finally, we dismiss Defendant's ineffective assistance of counsel claim without prejudice.
 

 NO ERROR IN PART; DISMISSED IN PART.
 

 Judges BRYANT and TYSON concur.
 

 [1]
 

 Our shortening of the Latin phrase "
 
 Lex purgandum est.
 
 " This phrase, which roughly translates "that which is superfluous must be removed from the law," was used by Dr. Martin Luther during the Heidelberg Disputation on April 26, 1518 in which Dr. Luther elaborated on his theology of sovereign grace. Here, we use
 
 purgandum
 
 to simply mean that there has been the removal of superfluous items, such as quotation marks, ellipses, brackets, citations, and the like, for ease of reading.